UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ELLETT Y. WALKER,

                                    Plaintiff,

v.

MICHAEL J. ASTRUE
Commissioner of Social Security,

                                    Defendant.
_____

**REPORT AND RECOMMENDATION**

08-CV-0828(A)(M)

        This case was referred to me by Hon. Richard J. Arcara to hear and report in accordance with 28 U.S.C. §636(b)(1)(B) [4].[1] Before me are the parties' cross motions for judgment on the pleading pursuant to Fed R. Civ. P. ("Rule") 12(c) [6,8]. For the following reasons, I recommend that defendant's motion be DENIED, and that plaintiff's cross-motion be GRANTED in part and DENIED in part.

**PROCEDURAL BACKGROUND**

        Pursuant to 42 U.S.C. §405(g), plaintiff seeks review of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income ("SSI") [8]. Plaintiff filed an application for SSI on September 21, 2005, alleging a disability onset of September 21, 2005[2] (T13).[3] The claim was initially denied on February 2, 2006 (T22-

---

[1]     Bracketed reference are to the CM/ECF docket entries.

[2]     Plaintiff originally alleged a disability onset of January 1, 1994, *See* T13 but amended her onset to September 21, 2005. T132.

[3]     References to "T" are to the certified transcript of the administrative record filed by defendant.

25). A hearing was conducted before ALJ William R. Pietz on February 12, 2008 (T227-54). Plaintiff was represented at the hearing by Kathleen Traina, a paralegal with the Erie County Department of Social Services' Legal Advocacy for the Disabled (T227). On March 5, 2008, ALJ Pietz issued a decision denying plaintiff's claim, finding that plaintiff had not been under a disability since September 21, 2005, and there were a significant number of jobs in the national economy that plaintiff could have performed. (T10-19). ALJ Pietz's determination became the final decision of the Commissioner on September 24, 2008, when the Appeals Council denied plaintiff's request for review (T3-5).

## THE ADMINISTRATIVE RECORD

1. **Medical Evidence**

    A. **Evidence of Plaintiff's Mental Impairments Prior to Her Alleged September 21, 2005 Onset Date**

    In July 1998 plaintiff presented with problems of "anxiety and hyperness" upon her admission to the Erie County Holding Center ("ECHC") (T138). Plaintiff indicated a past suicide attempt, and was diagnosed with personality disorder, not otherwise specified (T138-39). Upon her admission to the Erie County Correctional Facility in December 2000, plaintiff admitted that she had been "using drugs heavily since Oct. 1999" (T141). Plaintiff admitted attempting suicide three times in the previous six months because "drugs made [her] do it," but denied any current suicidal ideation (T142). Plaintiff was again diagnosed with personality disorder, not otherwise specified. Id. Upon admission to ECHC in January and March 2002, plaintiff was diagnosed with borderline personal disorder (T144, 146).

In July 2001 plaintiff was assessed by the Buffalo General Hospital Community Mental Health Center ("CMHC") (T220). Plaintiff alleged a history of sexual abuse and was diagnosed with post-traumatic stress disorder, bipolar disorder, and polysubstance abuse (T220, 224).

On February 1, 2005, plaintiff presented to the Erie County Medical Center ("ECMC") emergency room after "being found behaving erratically and menacing in public and threatening to . . . kill her boyfriend" (T94). Plaintiff was prescribed Seroquel and Celexa, but declined treatment for her substance abuse (T95). Plaintiff was discharged with a diagnosis of polysubstance abuse, and antisocial and borderline personality disorders were ruled out (T95-96). Her Global Assessment Functioning ("GAF") was 65 upon discharge (T96).[4] On February 12, 2005, plaintiff was treated in the emergency room for Seroquel and alcohol overdose, and she was discharged the next day, after agreeing to out-patient substance abuse treatment (T97-98).

In April 2005 plaintiff sought psychiatric care at Buffalo General Hospital after seeking treatment for an unrelated physical ailment, and at that time "no lethality [was] expressed" (T85-86).

---

[4] "GAF rates overall psychological functioning on a scale of 0-100 . . . . A GAF in the range of 61 to 70 indicates '[s]ome mild symptoms (*e.g.*, depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships'" Zabala v. Astrue, __ F. 3d __, 2010 WL 455480, *7 n. 1 (2d Cir. 2010) (*quoting* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 34 (4th ed. Rev. 2000)).

**B.    Evidence of Plaintiff's Mental Impairments After Her Alleged September 21, 2005 Onset Date**

On October 30, 2005 plaintiff, with a blood alcohol content of 0.22, presented to the Comprehensive Psychiatric Emergency Program ("CPEP") at ECMC, alleging that she had been raped (T102). Plaintiff was diagnosed with adjustment disorder and schizophrenia, and was discharged the same day (T112). Thereafter, plaintiff received psychiatric care in November 2005 through Horizon Health Services (T172). She complained of hearing the voices of her dead sister and grandfather. Id. In December 2005 plaintiff was denied admission to Horizon's program for failing to attend follow-up appointments and to complete the assessment process (T178).

In January 2006 plaintiff was assessed at ECHC after being arrested for assaulting her aunt and possessing drug paraphernalia (T159). Plaintiff was diagnosed with depression and drug and alcohol abuse (T160). In June 2006 plaintiff, feeling suicidal, presented again to CPEP after an altercation with a boyfriend (T147). Plaintiff claimed that she increasingly heard voices speaking to her (T149). Plaintiff was diagnosed with adjustment disorder, bipolar disorder, and schizophrenia (T156). Substance induced psychosis was ruled out (T156).

In October 2006, plaintiff was admitted into treatment with Alcohol and Drug Dependency Services (T173). She was discharged in December 2006, after successfully completing the program (T183).

In December 2006 plaintiff was referred to CMHC for anxiety and mood swings (T189). Plaintiff attended group therapy sessions, but was discharged in March 2007 for failing

to attend (T190). Upon discharge, plaintiff was diagnosed with bipolar disorder and post-traumatic stress disorder (T189).

In October 2007 plaintiff entered individual counseling for substance abuse and mental health issues at the Monsignor Carr Institute (T164). She was discharged in November 2007 after not complying with treatment. Id. Upon discharge, plaintiff was diagnosed with cocaine dependency, paranoid schizophrenia, and antisocial and borderline traits (T164). Her GAF was assessed at 50. Id. [5]

### C. Evidence Regarding Plaintiff's Alleged Asthma

Plaintiff is described as having "bronchial problems" while being treated at ECHC in January 2002 (T143). In April 2005 plaintiff presented to Buffalo General Hospital with a cough and shortness of breath, and was diagnosed with asthma and a respiratory infection (T84-86). Horizon's November 2005 psychiatric assessment lists "asthma" as a special medical need (T172). She was also diagnosed with asthma and a heart murmur upon her discharge from CMHC in February 2007 (T189).

---

[5] "AGAF in the range of 41 to 50 indicates '[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).'" Zabala, supra, 2010 WL 455480, *7 n. 2.

### D. Consultive and Independent Medical Examinations

Dr. Cheryl Butensky, a State Review Psychologist, concluded that there was insufficient medical evidence for any determination (T114, 126). Dr. Butensky's notes indicate that plaintiff failed to provide sufficient records for her to make a recommendation (T126).[6]

## 2. Administrative Hearing Conducted on March 13, 2007

### A. Plaintiff's Testimony

Plaintiff is 32 years old and educated through the ninth grade (T249). Plaintiff previously resided with her grandmother, but currently resides by herself (T242). Plaintiff has been arrested 4 or 5 times and spent time in jail from 1998 to 2002 for criminal possession of controlled substances and parole violations (T232-33). Plaintiff has previously used alcohol, marijuana, crack and cocaine, but has not used any controlled substance since September 28, 2007, after spending 3 months in a drug rehabilitation clinic (T238-39).

Plaintiff testified that she has not worked or looked for work since 1999 (T240). She was fired from her last job on work release because of her attitude Id.. Plaintiff attributed her inability to work to a learning disability, attitude, confusion in public, and an inclination to lash out by running off or becoming violent (T241). Although plaintiff's medications make her

---

[6] Dr. Butensky's Notes state in part:

"Claimant/atty rep. both received ADLS to complete. Forms not returned/due process sent to both. Spoke with atty . . . on 1/12/06 and atty. stated that forms will be completed with client/sent . . . informed atty. must be received by 1/23/06 . . . to date (2/2/06) not received, f/u call w/o response. Records in file from 2/05 - 4/05 from inpatient stay d/t drug overdose and ER visit. No current records/mer insufficient for determination." (T126).

less violent and confused, she still does not go outside unless she has someone with her (T242). For example, plaintiff testified that she was arrested for cutting her aunt for stealing her food. Id. Plaintiff testified that her physical ailments consist of asthma, arthritis of the back and knees, and an ulcer (T247).

Plaintiff testified that she has no transportation, and her mother helps her take care of basic activities such as shopping (T243). She cleans her house, cooks sometimes, and travels only to her cousin's or mother's house (T244). Her attention span is too short to enable her to read (T245).

### B. Vocational Expert Testimony

Julie Andrews, a vocational expert, testified that an individual who was "limited to light exertion; simple instruction; . . . no public dealing[s]; occasional supervisors; occasional dealings with supervisors and occasional dealings with coworkers; [and] avoid[ing] concentrated exposure to extremes of temperature and dust, fumes, and gases", would be able to work as a small products assembler or a housekeeper, which are unskilled positions that require light exertion (T250). In the regional area, there are 1,380 small products assembler positions and 580 housekeeping positions. Id. When asked if this same individual with the additional limitation of becoming frightened and occasionally becoming violent or running away could maintain employment, Andrews testified that the individual "would be unable to meet employers' expectations, and ultimately would end up getting fired from any position" (T252).

### 3. ALJ Pietz's March 5, 2008 Decision

ALJ Pietz found that plaintiff suffered from the severe impairments of "asthma, an affective disorder and questionable schizophrenia" (T15). He found that plaintiff did not have an impairment or combination of impairments that meets or medically equaled the criteria of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. ALJ Pietz concluded that plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 416.967(b),

> "except that she should avoid concentrated exposure to dust, fumes, gases, and temperature extremes; she can understand, remember and carry out at least simple instructions; she can occasionally deal with co-workers and supervisors; she should not deal with the public" (T16).

In reaching this conclusion, ALJ Pietz found that plaintiff's allegations were not credible. Id. Plaintiff's credibility was reduced by "her failure to cooperate with the Administration, her substance abuse history, her criminal history, her history of not complying with treatment, and her chosen bad attitude that she admits has led employers to fire her" (T17). ALJ Pietz found that plaintiff's asthma is well-controlled with medication, and her varying mental impairments have never been "clear[ly] and consistent[ly] diagnose[d]". Id.

ALJ Pietz did not determine whether plaintiff had the RFC perform the requirements of her past relevant work because plaintiff lacked a relevant work history (T17). However, based on the vocational expert's testimony, ALJ Pietz found that plaintiff was capable of making an adjustment to another field of work, and concluded that she was not disabled from September 21, 2005 through the date of his decision (T18).

## ANALYSIS

**1.     Scope of Judicial Review**

The Social Security Act states that, upon review of the Commissioner's decision by the district court, "the findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. §405(g). Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion". Consolidated Edison Co. of New York, Inc. v. NLRB, 305 U.S. 197, 229 (1938).

Under this standard, the scope of judicial review of the Commissioner's decision is limited. This Court may not try the case *de novo,* nor substitute its findings for those of the Commissioner. *See* Townley v. Heckler, 748 F. 2d 109, 112 (2d Cir. 1984). Rather, the Commissioner's decision is only set aside when it is based on legal error or is not supported by substantial evidence in the record as a whole. *See* Balsamo v. Chater, 142 F. 3d 75, 79 (2d Cir. 1998). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the Court's independent analysis of the evidence may differ" from that of the Commissioner. Martin v. Shalala, 1995 WL 222059, *5 (W.D.N.Y. 1995) (Skretny, J.).

However, before deciding whether the Commissioner's determination is supported by substantial evidence, the court must first determine "whether the Commissioner applied the correct legal standard". Tejada v. Apfel, 167 F. 3d 770, 773 (2d Cir. 1999). "Failure to apply the correct legal standards is grounds for reversal." Townley, supra, 748 F. 2d at 112.

## 2. The Disability Standard

The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §1382c(a)(3)(A). The impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. §1382c(a)(3)(B).

The determination of disability entails a five-step sequential evaluation process:

"1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a 'severe impairment' which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a 'severe impairment,' the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not 'listed' in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other

>work which the claimant could perform. The
>Commissioner bears the burden of proof on this last step,
>while the claimant has the burden on the first four steps."

Shaw v. Chater, 221 F. 3d 126, 132 (2d Cir. 2000). See 20 C.F.R. §§404.1520, 416.920.

>"New regulations, effective on August 23, 2003, limit the Commissioner's burden at step five. *See* 20 C.F.R. 404.1560(c) . . . . The Commissioner's step-four RFC determination (with the claimant bearing the burden of proof) now controls at both steps four and five. . . . The Commissioner applies the RFC determination from step four to meet his burden at step five. Using the claimant's RFC, the Commissioner must then show at step five that 'there is other gainful work in the national economy which the claimant could perform.'"

Spain v. Astrue, __ F. Supp. 2d __, 2009 WL 4110294, *3 (E.D.N.Y. 2009).

### 3. ALJ Pietz's RFC Determination Is Not Based Upon Substantial Evidence

Plaintiff argues that there is no competent medical evidence supporting ALJ Pietz's RFC finding because "there is no opinion evidence regarding her restrictions and limitation resulting from her severe mental impairments, which include her affective disorder and questionable schizophrenia. . . . There are no treating source opinions in the file. In addition there are no opinions from examining physicians and the Physiatrics Review Technique is incomplete . . . . The ALJ's findings in this regard were, in effect, a medical determination. An ALJ, as a layperson, is simply not competent or qualified to make such a determination." Plaintiff's memorandum of law [8], pp. 5-6. In response, defendant contends that it is plaintiff's burden to submit medical evidence showing that she could not perform work-related activities. Defendant's reply memorandum of law [9], p. 2.

ALJ Pietz found that plaintiff's severe impairments include "an affective disorder and questionable schizophrenia" (T15). He also found that "[t]he mental impairments result in no more than moderate restrictions of daily living activities; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and one or two episodes of decompensation." Id. ALJ Pietz determined that plaintiff had the RFC "to perform light work . . . except that she should avoid concentrated exposure to dust, fumes, gases, and temperature extremes; she can understand, remember and carry out at least simple instructions; she can occasionally deal with co-workers and supervisors; she should not deal with the public" (T16). With respect to plaintiff's mental impairments, ALJ Pietz noted that

> "The claimant has a history of mental impairments. There have been varying diagnoses that include: schizophrenia, bipolar disorder, depression, an adjustment disorder, and a so-called 'personality disorder' but none of these have been clear and consistent diagnoses. There have been periods during which the claimant has chosen to be combative and resistant to treatment. The claimant's treatment consisted of counseling and pharmacotherapy and this treatment has taken place within the context of substance abuse treatment; however, the claimant has not always been compliant. Global Assessment of Functioning (GAF) scores have ranged from 65 (no more than mild symptoms and limitations) to 50 (barely serious symptoms and limitations); however, these were in the presence of polysubstance abuse - even as recently as October 2007." (T17).

The RFC determination is reserved for the commissioner. See 20 C.F.R. §§404.1527(e)(2) and 416.927(e)(2). However, "an ALJ's RFC assessment is a medical determination that must be based on probative medical evidence of record. . . . . Accordingly,

an ALJ may not substitute his own judgment for competent medical opinion." Lewis v. Commissioner of Social Security, 2005 WL 1899399, *3 (N.D.N.Y. 2005).

Thus, "an ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence. Where the 'medical findings in the record merely diagnose [the] claimant's exertional impairments and do not relate these diagnoses to specific residual functional capabilities such as those set out in 20 C.F.R. §404.1567(a) . . . [the Commissioner may not] make the connection himself.'" Deskin v. Commissioner of Social Security, 605 F. Supp. 2d 908, 912 (N.D.Ohio 2008). *See* Isaacs v. Astrue, __ F. Supp. 2d __, 2009 WL 3672060, *11 (S.D.Ohio 2009) ("The ALJ rendered her RFC finding for medium work without reference to any medically determined RFC opinion bridging the raw medical data to specific functional limitations. Because there is no medical source opinion supporting the ALJ's finding that the plaintiff can perform 'medium' work, the Court concludes the ALJ's RFC determination is without substantial support in the record").

The record upon which ALJ Pietz based his RFC assessment consisted of a series of mental health records, the Psychiatric Review Technique of Dr. Butensky, which concluded that "no current records/MER insufficient for determination", and testimony of plaintiff (T126).[7] However, there was no RFC opinion from any medical source.

---

[7] Defendant argues that Dr. Butensky "opined that there was insufficient evidence to show that plaintiff had disabling mental limitations". Defendant's memorandum of law [9], p. 4. This argument is undercut by Dr. Butensky's notes which indicate that the medical records were insufficient for any determination. *See* (T128) (The Failure to Cooperate & Insufficient Medical Evidence form sent to plaintiff had the box labeled "A medical decision cannot be made based on evidence in file" checked).

In light of the non-adversarial nature of a benefits proceeding, where there is a gap in the record, the ALJ must affirmatively develop evidence to fill it. Pratts v. Chater, 94 F. 3d 34, 37 (2d Cir.1996). This duty exists whether or not plaintiff is represented by counsel. Perez v. Chater, 77 F. 3d 41, 46 (2d Cir.1996). "Although it is the claimant's obligation to prove her disability and provide all relevant medical evidence, '[i]f the evidence does not give the ALJ 'sufficient medical evidence about [the claimant's] impairment to determine whether [the claimant is] disabled,' a consultative exam may be ordered, at SSA's expense.'" Aristizabal v. Astrue, __ F. Supp. 2d __, 2009 WL 4666035, *1 (E.D.N.Y. 2009).

Although I recognize that "where the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment", this is not such a case. Manso-Pizarro v. Secretary of Health and Human Services, 76 F. 3d 15, 17 (1st Cir. 1996). Given the limited evidence in the record of plaintiff's functional limitations from her mental impairments, including the lack of any treating or consultative opinions concerning the extent of these limitations, I conclude that ALJ Pietz should have ordered a consultative psychological examination or attempted to contact plaintiff's treating physicians to complete the record in order to make a proper RFC determination. *See* Hopper v. Commissioner of Social Security, 2008 WL 724228, *11 (N.D.N.Y. 2008) ("Since there was little to no evidence in the record to determine Hopper's RFC properly, the ALJ should at least have attempted to contact Hopper's treating physicians. . . . Additionally, the ALJ could have employed a state agency medical consultant rather than a disability analyst to render an assessment of Hopper's RFC. The record reveals that the ALJ made no such attempt to obtain the opinions of any treating physicians or

other medical sources by way of letters requesting the information nor by subpoena"); Hogan v. Astrue, 491 F. Supp. 2d 347, 354-355 (W.D.N.Y., 2007) (Larimer, J.) ("The ALJ found that plaintiff retained the RFC to perform less than the full range of sedentary work. In reaching this conclusion, the ALJ did not cite to a medical opinion in the record. It is unclear whether the ALJ relied on the opinions of plaintiff's treating physicians, or the opinions of the examining and consulting physicians. In fact, there is very little in the record regarding plaintiff's ability to perform basic work activities. In this respect, the ALJ needs to further develop the record . . . because the ALJ failed to cite to any medical opinion to support his RFC findings, the Court is unable to determine if the ALJ improperly selected separate findings from different sources, without relying on any specific medical opinion"). Without this additional medical evidence ALJ Pietz, as a layperson, could not bridge the gap between plaintiff's affective disorder and schizophrenia and the functional limitations that flow from these impairments.

Even assuming that plaintiff's GAF scores relied upon by ALJ Pietz, standing alone, were sufficient medical evidence of plaintiff's functional limitations, ALJ Pietz appeared to make a medical determination in discounting these scores by attributing them to plaintiff's substance abuse problems as opposed to her mental impairments (T17).

Further, despite finding plaintiff incredible, ALJ Pietz appeared to credit some of plaintiff subjective allegations in reaching his RFC that plaintiff "can understand, remember and carry out at least simple instructions; she can occasionally deal with co-workers and supervisors; she should not deal with the public" (T16). However, without explanation, ALJ Pietz appeared to discredit certain of other plaintiff's self-described limitations, including

plaintiff's testimony that in social situations she becomes uncomfortable and sometimes runs off or becomes violent (T241-242). This is significant because the vocational expert testified that an individual with these limitations "would be unable to meet employers expectations, and ultimately would end up getting fired from any position" (T252).

Therefore, I recommend that this case be remanded to the Commissioner to conduct a proper analysis of plaintiff's RFC.

## CONCLUSION

For these reasons, I recommend that defendant's motion for judgment on the pleadings [6] be DENIED, that plaintiff's cross-motion for judgment on the pleadings [8] be GRANTED in part and DENIED in part, and that the case be remanded to the Commissioner for further proceedings consistent with this Report and Recommendation.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by June 28, 2010 (applying the time frames set forth in Fed. R. Civ. P. 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules of Civil Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 72.3(a)(3), may result in the district judge's refusal to consider the objection.

**SO ORDERED.**

DATED:   June 11, 2010

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge